Good morning, Your Honors. May it please the Court, Neal Lloyd. I'm here this morning for efficiency to present argument on behalf of the Appellees in No. 23-55368, the Injunction Appeal, and the Appellants in No. 23-55060, the Intervention Appeal. I'm joined by my law partner Rachel Remke from Aaron Fox Schiff, and at the end of the table by Maggie Ebert from QTAC Rock, who is trial counsel for WG in the ongoing proceedings that remained after the District Court's order, part of which is before the Court. Because an affirmance in the Injunction Appeal will moot the Intervention Appeal, I'd like to start with two points about the Injunction Appeal. First is the $322,000. I'd like to take a minute to point the Court to the undisputed record evidence showing that this money was spent properly and is fully accounted for. If the Court looks at excerpts of record 376-405, which is Exhibit L to WG Summary Judgment Opposition, there's an email exchange between counsel for the parties, and it's followed by several redacted pages. These redacted pages contain financial information from WG prepared by a CPA and disclosed in that email exchange to the plaintiffs. The excerpts of record contain the public filing. Docket 159 at 136-155 is the sealed filing, which is available to the Court. I brought copies today in case the Court would like to look, and I have a copy for opposing counsel. The first redacted page is a full accounting to the penny of this $322,000, followed by 25 lines, with 25 lines and pages and pages of backup. Counsel? Yes, ma'am. What about the equity interest, though? The equity interest? Well, this was a failed startup, and the WG group had 100% of the license, so the equity interest was an interest in the venture going forward. The equity interest was not a purchase for a license. But isn't all of that something that could be sorted out in the breach of contract action, as opposed to putting it as part of the injunction action? Well, so let me parse that for the Court. So we're here under a slightly unusual procedural posture, because normally everything would be wrapped up in a nice bow at the end of summary judgment. And so the reason in this instance, and the Court's precedent is clear, and we haven't disputed anything about jurisdiction, because the predicate for the preliminary injunction was the likelihood of success on the merits for a DTSA claim. The DTSA claim in turn, because they're not the holders of the trade secret, depends on a license. The failure of the DTSA claim means the failure of the license. The failure of the license means the failure of the DTSA claim. Then the failure of that means the dissolution of the injunction, and 1292A1 brings that up. Correct. Right. So what I'd like the Court to focus on in particular is the language of the contract and whether it creates a license, because I think that since that was their contention initially, the initial contention to the District Court was, we will be able to prove a license. Now in their briefing, they actually say, we say incorrectly, repeatedly, and if the Court juxtaposes what they say, including in their reply brief, when they use an unusual bracketed D to say that the District Court actually found that they had a license, when if the Court compares those, that's not what the District Court said, and I realize review's the no vote, but I do think it's very important for the Court that, I think the District Court has a hard enough job not to have its statements misstated to this Court. The point here is that they're contending in both of their briefs that the 322,000 is somehow payment for a license, and as you say, Your Honor, that this somehow gets into the equities. That is simply not true. I didn't think the 322,000 was payment. I thought the 500,000 was the payment. Well, the 500,000, Your Honor, is actually the startup funds, 170-some thousand which went to marketing, and 322,000 which went to WG. And the point is, for example, on page 11 of their reply brief to this Court in the injunction appeal, the plaintiffs contend effectively that we don't know where this money actually went, and so the reason I'm an untrue statement. There is a line-by-line itemization of the 322. It was spent for setting up a lab. It was spent for prototype development. So the idea that, you know, to Judge Rawlinson's question, that there was somehow an equity interest plus 322,000, and therefore the Court can fill in missing terms in the OSC contract and divine a license, that 322 was never for an exclusive license. It's clear in the OSC itself, and the reason why I mention this part of the sealed record is if all the Court was looking at was the excerpts of record, you've got an email exchange between the parties. One says, hey, I want your financials. The other says, I'm giving you the financials, followed by dozens of blank pages. And it's only, I believe, because of those dozens of blank pages that you would actually get a reply brief that would say, we don't know where this money went, because it's just not from what Judge Rawlinson was saying. It just seems to me this all should be sorted out in the breach of contract action, because it's like a mess at this point, because you made the statement that DG owned the license, but now you've got Dr. Martin saying, well, no, I own it, or at least part of it, and you shouldn't have entered into the contract in the first place. I don't know where, all of a sudden, Martin's in the middle of this, and it just seems like the whole thing's kind of a convoluted mess, is the way I could... And I appreciate that, and part of the reason why I think that the easiest path to a clear decision in this case is looking at the second district judge's decision in the injunction in the summary judgment decision, because the predicate for the injunction in the first place, the predicate for the DVSA claim, is whether there is a license. And there is no specific performance on this breach of contract claim. By the way, but the breach of contract claim's going to trial in July, June or July, and on that claim, you didn't do what you were supposed to have done, the parties say, in this failed startup. But what is clear from the contract itself, the three places where the contract mentions licensure, all of them are forward-looking. And so where I think, Judge Malloy, that we can detangle this and we can get to a decision where the court affirms and then lets the parties sort out for damages the remaining claims, but doesn't have a DTSA claim where there's a contention that there could be an ability to prove a license based on this contract, this startup contract. This was a multi-phase situation, where in the first phase, the parties said, we desire to create this special purpose vehicle that will be the licensee. So the notion, and we're here, right, because as an initial matter, the plaintiffs went to the district court, they said, we think we'll be able to prove a likelihood of success. The district court granted an injunction. The parties then proceeded through discovery. They then moved for summary judgment. And the district court looked at it and said, well, you're moving for summary judgment on a claim for which you've got the burden of proof. Put all your cards on the table. The court looked at the cards, and the cards didn't add up to a license. So it was appropriate in that context, in this sort of rare procedural situation where you're reviewing what would otherwise be an interlocutory summary judgment order. I think that the district court got it right. The question that was posed to the court, right, was, do you get a license and therefore do you continue with injunctive relief, or do you not have a license? And they moved for summary judgment on that, and the court said, I've looked at the evidence. It's all forward-looking. The licensee didn't exist at the time of the OSC. And all of the material terms that the court would expect to see in an enforceable license, including at the threshold, grant language, like we desire to obtain a license, we desire to grant to you a license. All of those things are missing from the OSC, and it's clear why. Course of performance here, which California law says you can provisionally look at, which the district court looked at, what was the course of performance here? Well, they started the first part. The $500,000 went in. $170,000 of it went to marketing. $322,000, as I said, in that docket 159, the sealed information, you can see line by line how that was spent. What was the next step? We're going to hire counsel and we're going to start negotiating about a license. And what happened? There was a failure of the meeting of the minds of the parties, because one of the parties believed that this was going to be a narrow license for a very specific use. One of the other parties said, no, this is going to be a broad license of infinite duration, of infinite scope. And that's where everything broke down. Now, to, again, the last point in terms of sorting all this out, what does the OSC then mean in terms of licensure? And it's before the court in the injunction order that is specifically appealed by the plaintiffs. But the subsequent part of which the court can take judicial notice is the third district judge on the case said, you know what? I think that this gives rise to a claim whether the parties negotiated in good faith. And if they didn't negotiate in good faith, then there's a damages remedy. But there's not a specific performance remedy, because specific performance requires a mirroring of what the contract provides and what the relief would be. And this contract absolutely positively just does not provide for a license. And the court can't infer a license based on aspirations that the parties had to have a successful startup. At the end of the day, Your Honors, this was a business that failed. And like many startups, it failed. And now it's resulted in litigation. But what the initial agreement that the parties had was to do that first step. It was not for a license. If I may, I'd like to reserve  So, counsel, what are you urging us to rule in terms of the district court decisions in this case? I'm urging you to rule first that the district court got it right in terms of the grant of summary judgment against the plaintiffs. That then necessarily means that the injunction fails. And because there is no DTSA claim, the intervention appeal by Dr. Martin is mooted. And there's nothing to be done with that, because that intervention claim was predicated on discovery that related to the actual license dispute. I'm always hesitant to not accept a concession, because it makes our job easier. But if Dr. Martin's claiming he owns 30% of the license, why is he not still in the case? Well, I beg your pardon, Your Honor. I don't think that Dr. Martin has claimed that he owns 30% of the license. I want to make clear. His contention was that because of a discovery order, a different iteration of this isomorphic distillation technology had come to the fore. So this had happened in the fall of 22. And at that point, he, who was a co-owner, but was not a party to this contract, thought that he needed to step in because of the difference between AE-1 and CP-3. Well, whether it's 30%. He claims he's a co-owner of the patent, but the contract says, was it DT or whatever it was, they were 100% owners. So there's definitely a conflict there. Well, no. Well, I respectfully disagree, Your Honor, because what's happening here is each of them are owners. They're co-inventors of the technology. And each of them has an ability to provide licensure for it. And so that's not a conflict. There's not a conflict between them and that contract. Well, counsel, before us, the issue with Dr. Martin is the permissive intervention. That's the only issue we have. That is correct. We don't have any issue about what his ownership was or any of that. The only issue before us is whether or not the district court properly denied permissive intervention. That is 100% right, Your Honor. And the reason I'm saying, and we recognize that that's a highly deferential standard. We recognize it's a high hurdle for us to meet. And in light of the way that events have unfolded since the intervention appeal was filed and the district court ruled on the injunction, events have sort of taken over. And so if the court affirms on the injunction appeal, then the intervention appeal would be moot. And I think that's the easier path. So we would ask the court to affirm in the injunction appeal and to dismiss as moot in the intervention appeal. And I'd like to reserve the balance of my time. All right. Thank you. Thank you. Good morning, Your Honors. I'm Edward Smithers of Smithers Law Firm. I'll be arguing Genesis's appeal from the Sua Sponte Summary Judgment Order. With me today is Mary Ann O'Hara, also of Smithers Law Firm. And she'll be addressing the intervention issue. Also at counsel table is Lawrence Hinkle of the Sanders Roberts Firm, who is going to try the case with Mary Ann and I. The case is a bit of a mess, to be honest with you. The way the case has unfolded, we've been through three judges. The first judge looked at pretty much every piece of evidence. She issued a 21-page order, finding that there was a likelihood of success on the merits that we'd be able to show an exclusive license. This was not some sort of rush-to-court situation. I think everyone has looked at her order. It is very detailed and very well thought out. Based on the information that was before her at that time. Exactly. And as I look at this case, if this were a situation, Your Honor, where somehow our declarations changed when they were put under scrutiny, a deposition, then I can understand how you could have a situation where an injunction would be dissolved. I invite the court to look at our declarations. I invite the court to look at our deposition. We have looked at the declarations. We have looked at the depositions. And there was some elucidation in the depositions that was not in the declarations. There was a little bit more information regarding the licensing situation. I could not agree more. The point I'm making is that in our declarations, each of our witnesses said we understood when we were putting in this money that we were getting an exclusive license. But in the depositions, they said we understood that a license would be required. And there was no introduction into the record of a license that had been issued. Well, that's a very clever turn of phrase in the Respondent's Brief because it doesn't have the timeline. When that question is being answered, as we've tried to point out in our Supply Brief, this is several months later. This is in 2020. So on September 5th, 2019, we get a signed oil services contract. Seven days later, we get a signed operating agreement. Not a license, though. That's the problem. Usually licenses are in writing, and they're signed by both parties. It's either an exclusive license or a non-exclusive license. And the amount of money for the license is in there. And so to me, that's what's missing from the record that would solidify the fact that a license was actually granted. If I can just go back to the timeline just for a moment, because it's very important, I think, for this Court to understand when we're going back and forth on all these very long, detailed license agreements, this is in 2020. This is after the fall of 2019 where we've already put in the money. This is after we have the signed agreement. And my people are business people, and they did what you should do as a good business person. You try to reach an agreement with the other side. Dr. Wiseman and his group simply were not going to perform. We could not push them off the starting block. We have a client in Belize who wants to get going, and so we're willing to make concessions. What that doesn't mean is that somehow our initial license agreement just disappears. That existed at all times. I have a question. Where is the initial license agreement in the record? It's in the oil services contract. And if there's any question about what that means, then we look at the extrinsic evidence. And that extrinsic evidence comes in to show a meaning that the language is reasonably susceptible of. Well, can you point me to the precise language in the contract that indicates Wiseman's intent to grant an immediate exclusive license to Genesys? Or just tell me what page. On pages one and two of the contract. And would you like the record site?  Sure. We're looking at 5ER1159. 5ER1159. At the bottom of the first page, it says exclusive oil field pipeline. And it does say would enter, but that's not unusual in contracts where people perhaps don't have the level of lawyering that we're finding with us here today. In retrospect, yes, you could have said here is the exact license. But the reality is our folks certainly thought they were getting a license. If they weren't getting a license, I have to ask the panel, what were they getting? A seat at the table to negotiate some unknown license? We don't have to answer that question. But the deposition testimony seemed to reflect that your clients knew that they would have to get a license. And they didn't say that the license was in the operating agreement. But they did, Your Honor. I would just again point to the excerpts from the deposition and the declarations as part of our appellant's opening brief. And then we reiterate them in our reply brief. Our corporate designee, Mr. Jimmy Smith, who's with us here today, he testified I think four or five separate times, yes, it's an exclusive license in the oil services contract. He's our corporate designee saying that. The deposition testimony they rely on is from Susan Adelman, who's talking about the 2020 efforts to put this deal back together. It's not referenced in their brief that that's in 2020, but it's undisputed. If your court disagreed that there was a licensing agreement in the oil services agreement, do you lose? I think we get to a jury on that, to be perfectly candid with you, Your Honor. Do you think that's a material issue of fact? It certainly is when the parties dispute what the language means. And we have admissions by the other side that they considered it to be a license. I did cite those in our brief that where we have Mr. Wiseman, excuse me, Dr. Wiseman, talking about how he views the license. This is at 6 ER 1190 to 91. It's a December 9th email. And I try not to read into the record too much at oral argument. Well, let me ask you this. So what you're arguing you're getting in this is for $500,000 you'd get 57% of the special purpose vehicle and the other and the licensor would get the other 42% roughly in return for the license. Is that what the agreement would be? For $500,000 you got 58% of the license. The defendants get 42.5% and that's how they're remunerated by licensing the technology. Because under your theory, there's no royalty or any payment other than that. Is that your theory of the case? Right. But when you say payment other than that, that's if this deal in Belize is profitable, that's a huge windfall for the defendants because they get 42.5% of the profits. I understand that. So they get 42% of the profits if it's a successful venture, you are valuing the license, so to speak, at about $200,000. I'm sorry, Your Honor. I know. I'm probably not doing the math right. But for $500,000 you're getting 58% of the profit and for the license they're getting 42% of the profits. Yes, the math is right but you're using the wrong number to divide by. The number to divide by is if we make a $10 million profit on this deal, they get a 4.25 profit million. So we don't take 42.5% of the $500,000. And that is a very good point because what they raised in their brief is that the $322,000 was not for the license. That's not license consideration. If I accept that as true, then what is the purpose of the 42.5% equity? It has to be for the license. This would have been a deal where everyone had the potential to make a great deal of money. Counsel, do you disavow the deposition testimony of Ms. Adelman who said that they were supposed to pull together a license agreement that was called for in the contract? Do you disavow that testimony? I do not disavow it. I put it in context, which is in 2020. This is when we know that we've unfortunately got into bed with someone who's not going to do what they said they were going to do. And we're trying to reach some sort of agreement because we have this deal in Belize which can be extremely profitable. So I don't disavow it at all. And that's true in 2020. It doesn't mean that somehow we reward him for not performing the oil services contract by saying, oh, you get a free square. We're not going to hold you to the oil services contract. When it turned out it was impossible. Well, the oil services contract, the breach of contract action is still viable, correct? It is, but it's been greatly curtailed by our third judge who now looks at this case along with Judge Sykes as simply being an agreement to negotiate in good faith and use your best efforts. So that's a far cry from suing for breach of a license. Thank you, Counsel. Thank you so much, Your Honor. Good morning, Your Honors. I'm Marian O'Hara, and I'm here today asking the Court to uphold the denial of the permissive intervention motion filed by Dr. Martin. In this appeal, Dr. Martin relies on several arguments not made below to attempt to establish an abuse of discretion by the District Court. For instance, Dr. Martin told this Court a different story about intervention than he told the District Court. In his opening brief, he claimed that the only reason he was intervening was because he was concerned about the October 2022 discovery order, compelling discovery of AE1. In contrast, he told the District Court repeatedly he was intervening for the limited purpose of overturning the injunction order entered in March 2021, which he claimed was trampling his rights to both CP3 and AE1. In his reply brief, Dr. Martin concedes that he was concerned about CP3, but claims that AE1 was the major reason for his intervention. This argument is contrary to the evidence and the arguments presented to the District Court. When he filed his ex-party application for intervention, he asked the District Court to overturn both the discovery order and the denial of that request. When he followed up with his notice motion, Dr. Martin abandoned his request to have the Court overturn the discovery order. Because he repeatedly told the Court that the only reason for the intervention was to overturn the injunction, it was reasonable and appropriate for the Court to use the date the injunction was entered as the starting point for its analysis. The Court assumed without deciding that Dr. Martin himself identified the earliest point at which he could or ought to have intervened, the date the injunction was entered, because of the arguments that Dr. Martin made that he was harmed by that. If in fact Dr. Martin was the owner of CP3, as he now claims he is, he should have intervened immediately upon learning of the lawsuit, because the outcome of the lawsuit could negatively impact those claims. He failed to provide any explanation to the District Court for his delay in intervening after the lawsuit was filed, let alone after the injunction was entered. Another new claim that Dr. Martin is making on appeal is that his interests were not adequately represented by the existing parties. Genesis argued below in opposing the intervention that his interests were adequately represented. Dr. Martin never provided any evidence or made any argument to the District Court to the contrary. The fact that Dr. Martin and the Wisman defendants are currently represented by the same counsel undercuts this new argument. Another new argument on appeal is that the there's a change in circumstances justifying Dr. Martin's delay in intervention. Again, this is an argument that was not made before the District Court. Dr. Martin concedes he did not use the words change in circumstances. He did not cite the Smith and Oregon cases that he relies on now to the District Court. He withdrew his request, or abandoned his reorder, so it's difficult to figure out how the District Court should have known that Dr. Martin was conceding that this was a change in circumstances that should be used as the starting point for the analysis. Finally, the Court properly found that intervention at this stage of the litigation would further delay the resolution of this protracted case. The Court found prejudice, undue prejudice, to the existing parties. Genesis would be prejudiced by having to defend these new ownership claims without having the opportunity to conduct discovery on them. Discovery, including expert discovery, has already been completed, and Genesis does not know really the extent of Dr. Martin's claims and defenses that he would be asserting as a full party in the litigation, because he didn't file a separate pleading. So Genesis respectfully requests that this Court affirm the order denying permissive intervention. Thank you, Counsel. Thank you. Rebuttal? Thank you, Your Honors. Two points I'd like to make in rebuttal. First of all, California law, unusual among contract law in other places, has a two-step process for contract interpretation. Certainly we look at the words of the contract first, then we look at specific types of parole evidence. But we never look at the subjective beliefs of the parties unless you get to the point of declaring an actual contract ambiguity. So when my learned opponent says, let's look at what are, when we're in litigation, the subjective beliefs that we had about the contract, that's evidence that California law says you should never consider, again, absent a full trial on what the contract means. What should you consider? Contemporaneous evidence before a dispute arose. They signed the oil services contract, and then they started negotiating a license, which is exactly what, on page 1159 of the Exhibit of Records, was contemplated by the contract. It wasn't a license. In fact, I point the Court to the 1160, at the third parties, so they desire to start a new SPV in Delaware that will obtain a licensing contract. In the OSC itself, it calls the licensing contract a different document from the OSC. That's what they then went and negotiated. Right, but then on 1191, there's this statement by Wissman that the technology is a process that has been licensed. That was in marketing materials, Your Honor, and in a startup venture, it is absolutely true that what you say to third parties is not necessarily what's actually the reality behind the scenes when you're negotiating. So that was not an admission by him that there was a license. He was trying to get investors interested in it. So those were marketing emails. Those were not admissions. In contrast, Ms. Adelman's deposition testimony is a statement against interest, and that is an admission. And as Judge Rawlinson said, that's a statement that the parties knew. This whole notion that the equity interest was a license, that the 322 was a license, these are all litigation positions that are inconsistent with the plain language of the contract. We accordingly, as we said, urge the Court to affirm the order in the injunction appeal and to dismiss the intervention appeal as moved. I thank the Court for its time and consideration. Thank you, counsel. Thank you to all counsel for your helpful arguments in this challenging case. That concludes our calendar for the morning. We are in recess until 9.30 a.m. tomorrow morning. All rise. This Court for this session stands adjourned.
judges: RAWLINSON, Melloy, THOMAS